AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

1115 SOUTH WILLIAMSBURG COURT
STERLING, VIRGINIA 20164

)
)
)
)
)
)

Case No.  1:19-SW-104

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to Distribute Heroin |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Jenna Sullivan, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  **FEB.15.2019**

/s/
John F. Anderson
United States Magistrate Judge
*Judge's signature*

City and state:  Alexandria, Virginia

The Honorable John F. Anderson, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## <u>LOCATION TO BE SEARCHED</u>

The address known as **1115 S WILLIAMSBURG CT STERLING, VIRGINIA** is a two level, single family dwelling. The dwelling is constructed of light colored siding with red brick underneath, and brown trim. The numbers "1115" are affixed above the front door. The main entrance is situated right of center of the front of the structure. The driveway is positioned to the right of the structure with a concrete walkway leading to two steps which lead to the front door.

This location is within the Eastern District of Virginia.

## ATTACHMENT B

## <u>PROPERTY TO BE SEIZED</u>

1.      Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, and packaging of illegal narcotics substances, as well as the use of illegal controlled substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles, and syringes, and written articles on the use and effects of narcotics, diluents, and cutting agents.

2.      Items used in the manufacture of illegal narcotics substances, including precursor chemicals, chemistry guides, glassware, and flasks.

3.      Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets, and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records.

4.      Books, records, receipts, notes, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances.

5.      Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage, and expenditure of money.

6.      United States currency, precious metals, jewelry, and financial instruments, stocks and bonds.

7.      Photographs, in particular photographs of co-conspirators, assets, and controlled substances.

8.      Weapons, including but not limited to revolvers, semi-automatic pistols, rifles, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including but not limited to gun-cleaning kits, gun-sights, holsters, and receipts and documentation for the purchased of same, and related firearm paraphernalia.

9.      Cellular telephones, cameras, and records and receipts reflecting their ownership and use.

10.     Safes, both combination and key type, and their contents.

11.     Indicia of occupancy, residence and ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes, and keys.

12.     Any and all electronic data processing and storage devices, computers and computer systems, other digital media, keyboards, Central Processing Units, external and internal drives, external and internal storage devices such as magnetic tapes and disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEARCH OF    )
1115 SOUTH WILLIAMSBURG COURT      )      No.: 1:19-SW-104
STERLING, VIRGINIA 20164           )

Affidavit in Support of a Search and Seizure Warrant

I, Jenna Sullivan, Task Force Officer of the Drug Enforcement Administration (DEA), Washington Division Office, Washington, D.C., being duly sworn, depose and state the following:

1.    This affidavit is presented in support of an application for a warrant to search the residence located at 1115 South Williamsburg Court, Sterling, Virginia, 20164 (the "SUBJECT PREMISES"), as further described in Attachment A, and to seize evidence, as further described in Attachment B, related to narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846.

2.    I have included in this affidavit information necessary to support probable cause for the search warrant application. It is not intended to include each and every fact and matter observed by me or known to the government regarding the investigation. I have set forth only those facts necessary to support probable cause.

I. Background

3.    I have been a Deputy Sheriff with the Loudoun County Sheriff's Office since 2008. Since 2018, I have been assigned to the DEA High Intensity Drug Trafficking Task Force in Annandale, Virginia. At that time, I was deputized as a DEA task force officer empowered by law to investigate violations of the federal narcotics laws and related offenses and to execute search and seizure warrants issued under Federal Rule of Criminal Procedure 41.

1

4.      During my career in law enforcement, I have executed numerous arrest and search warrants in the investigation of narcotics-related offenses, resulting in the seizure of illegal drugs, weapons, and other evidence. I have interviewed many individuals involved in drug trafficking, and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by drug traffickers.

5.      Based on my training and experience, I am aware that:

a.   Drug traffickers often maintain, on their persons, in their vehicles, and in their residences, large amounts of United States currency in order to maintain and finance their ongoing criminal activities.

b.   Drug traffickers commonly make and maintain business records. Individuals involved in the manufacture, sale, purchase, and transportation of controlled substances generate and maintain writings, books, records, receipts, notes, ledgers, lists, airline tickets, money orders, package and shipping labels, and other memoranda to assist in their criminal activities. These materials are created and maintained in much the same way and for the same reasons as in legitimate businesses because drug traffickers, like legitimate business persons, must know the current status of the various illegal transactions in which they are involved. However, because drug trafficking is, by its very nature, clandestine and involves multiple complex financial transactions, the possibility of error and mistake is considerable due to the number, complexity, and frequency of the various transactions without the aid of records.

c. Drug traffickers commonly conceal contraband, including controlled substances, proceeds of drug sales, and records of drug transactions in secure locations within their residences and on their properties so that they may be readily accessed and concealed from law enforcement.

d. Drug traffickers conceal in their residences drugs, currency, financial instructions, precious metals, jewelry, and other items of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in narcotics trafficking activities.

e. Drug traffickers often amass proceeds from the sale of controlled substances and attempt to deposit these proceeds into domestic banks, and to use banking services, in order to conceal the source of the funds, cause them to appear legitimately earned, and spend them. Accordingly, drug traffickers often use and possess securities, checks, money orders, letters of credit, brokerage house information, real estate, shell corporations, and business fronts.

f. Drug traffickers commonly maintain books or papers, which reflect names, addresses and telephone numbers of their associates in drug trafficking. They also store such information, as well as photographs, messages, and personal notes in electronic equipment including, but not limited to, computers, cellular phones, and other electronic software and mediums.

g. Drug traffickers often take or cause to be taken photographs and video of themselves, their associates, their property, and evidence of their drug trafficking. These are usually maintained in devices that they retain in their possession and in residences.

3

h. Drug traffickers commonly use cellular phones and other communication devices to keep in constant contact with their suppliers, associates, and clients in drug trafficking.

i. Drug traffickers have been known to use computers and electronic data processing units, to include all internal and external storage devices and related hardware and software that might include addresses or telephone numbers in computerized files which reflect names, addresses, and telephone numbers of their associates in drug trafficking. They also use computers to maintain and electronically record receipts, notes, ledgers, owe sheets, financial information, money orders, and other papers relating the transportation, ordering, sale, and distribution of controlled substances. Drug traffickers have also been known to use computers as a communications device to keep in constant contact with their suppliers, associates, and clients in drug trafficking through the use of internet service providers and electronic mail systems.

j. Drug traffickers often keep paraphernalia for packaging, cutting, weighing, and distributing narcotics, and this paraphernalia includes, but is not limited to, scales, plastic bags, cutting agents, and other items used to package and store drugs so they can be distributed without being easily detected.

6. Law enforcement officers used multiple cooperating sources (hereinafter CS-1, CS-2, and CS-3) during this investigation. The CS' information has been corroborated through various investigative techniques, to include analysis of telephone toll records and various surveillance techniques. Where possible, the information provided by the CSs has been

4

corroborated through other cooperating sources. To my knowledge, none of the information that the CSs have provided to law enforcement has proved to be false, misleading or inaccurate in any material respect. For these reasons, I have deemed each CS's information to be reliable.

II. Facts Establishing Probable Cause

7.     The DEA and LCSO are investigating the activities of a heroin and fentanyl drug trafficking organization (DTO) operating in and around Sterling, Virginia, within the Eastern District of Virginia. Through call data record analysis, GPS monitoring, surveillance cameras, physical surveillance, and information obtained from confidential sources, law enforcement identified several individuals working for the organization, including, JOHNSON, who is the head of the DTO; MARCH, who is a re-distributor and courier for JOHNSON; NGUYEN, who is a re-distributor and runner for JOHNSON; LIVENGOOD, who is a re-distributor and courier for JOHNSON; BOWERS, who is a runner for JOHNSON; and WOLTNER who is a re-distributor for JOHNSON. Investigators determined that NGUYEN and JOHNSON lived together at the SUBJECT PREMISES.

8.     During the month of January 2019, law enforcement obtained a cell phone ping for JOHNSON's, MARCH's, and LIVENGOOD's cell phones. Additionally, during January 2019, tracking devices were deployed on JOHNSON's, MARCH's, and WOLTNER's vehicles.[1]

9.     During the month of January 2019, law enforcement debriefed a cooperating source (CS-1) about WOLTNER's drug trafficking activities. CS-1 advised he has purchased heroin from WOLTNER for several months. CS-1 advised that WOLTNER always needs the money upfront and WOLTNER advises CS-1 that she has to travel to a location to purchase the heroin and returns approximately two hours later with the heroin.

---

[1] These orders and warrants were authorized by Virginia judicial officials.

10.     On January 10, 2019, at the direction of investigators, CS-1 contacted WOLTNER via text message and arranged to purchase $200 worth of heroin and to pay his $200 debt from a previous heroin purchase. WOLTNER told CS-1 that she needed the $400 up front and would then travel to pick up the heroin.

11.     On January 10, 2019, investigators provided CS-1 with $400 in buy funds and an audio recording device.[2] A detective acting in an undercover capacity (UC-1) drove with CS-1 to the controlled purchase at a gas station in Sterling, Virginia.

12.     Investigators at the gas station saw WOLTNER in the parking lot. She was the sole occupant of a vehicle that was registered to her. At approximately 11:16 p.m., CS-1 and UC-1 arrived at the gas station and parked near WOLTNER. CS-1 approached the driver's side of WOLTNER's vehicle and provided WOLTNER with $400 in buy funds before returning to the vehicle with UC-1.

13.     WOLTNER left the area and investigators surveilled her as she drove directly from the gas station to the SUBJECT PREMISES, which investigators have confirmed as JOHNSON's address. Investigators observed WOLTNER walk into the SUBJECT PREMISES and remain there for approximately one hour. At approximately 12:54 a.m., WOLTNER got back into her vehicle and investigators observed her drive directly to her apartment in Sterling, Virginia.

14.     WOLTNER then contacted CS-1 and advised him to come to her residence and retrieve the heroin from the driver's side door of her unlocked vehicle. Investigators maintained surveillance of WOLTNER's vehicle until CS-1 and UC-1 arrived at the residence. CS-1 exited

---

[2] Before and after each of the controlled transactions, law enforcement officers searched the cooperating sources for narcotics and currency. None of the searches yielded narcotics or currency.

UC-1's vehicle and opened the unlocked driver's side front door of WOLTNER's vehicle and retrieved one baggie containing a powdery substance consistent with heroin. CS-1 got back into the vehicle with UC-1 and provided the suspected heroin to UC-1.

15.     Investigators submitted the substance to the Virginia Department of Forensic Science (DFS) for chemical analysis. Analysis is pending.

16.     Investigators reviewed call detail records around the time of controlled purchase between CS-1 and WOLTNER. According to the records, CS-1 contacted WOLTNER and WOLTNER immediately contacted JOHNSON. WOLTNER and JOHNSON then exchanged several text messages before WOLTNER contacted CS-1 again and advised him of the meeting time and location.

17.     During the week of January 15, 2019, law enforcement debriefed a confidential source (CS-2) who advised that NGUYEN had recently reached out to him on Facebook using the user name "Khem Nguyen" and offered to sell CS-2 heroin. NGUYEN told CS-2 that he sells heroin for "his guy" who goes by the nickname "Ricky." Investigators identified "Ricky" as JOHNSON.

18.     On January 15, 2019, CS-2 contacted NGUYEN on Facebook messenger and asked to purchase one gram of heroin. NGUYEN told CS-2 that "his guy" would be good any time after 5:00 p.m.

19.     Investigators conducted surveillance at the SUBJECT PREMISES prior to the controlled purchase. Investigators observed a vehicle registered to LIVENGOOD outside this residence. Investigators have determined that this vehicle is used by JOHNSON and LIVENGOOD.

20.     At approximately 5:08 p.m., investigators met with CS-2. Investigators instructed CS-2 to contact NGUYEN via Facebook messenger in their presence and to let NGUYEN know that CS-2 would be ready to meet in 30 minutes. NGUYEN responded and told CS-2 to come to the TARGET PREMISES and go around back. CS-2 asked NGUYEN how much it would be for one gram and NGUYEN replied that he was going to "ask him." Shortly after, NGUYEN replied that a gram would be $150. Investigators provided CS-2 with $150 in buy funds and an audio recording device. A detective acting in an undercover capacity (UC-2) was also utilized. CS-2 and UC-2 drove together to the SUBJECT PREMISES.

21.     As CS-2 and UC-2 were on the way to the SUBJECT PREMISES, investigators observed NGUYEN exit the rear of the SUBJECT PREMISES and stand in the driveway. At approximately 5:47 p.m., CS-2 and UC-2 arrived at the SUBJECT PREMISES. NGUYEN approached the vehicle and engaged CS-2 through the passenger side window. CS-2 provided NGUYEN with $150 in buy funds and NGUYEN provided CS-2 with a plastic bag containing a powdery substance consistent with heroin. NGUYEN told CS-2 to be careful with the heroin.

22.     Following the controlled purchase, CS-2 provided the suspected heroin to UC-2. Investigators field-tested the substance using a field-test kit which was positive for heroin. The item was packaged and submitted to DFS for chemical analysis. The analysis is pending.

23.     On January 16, 2019, CS-1 contacted WOLTNER by text message and asked to purchase $350 worth of heroin the following day. WOLTNER told CS-1 that she needed to travel to pick up the heroin and needed the $350 upfront. WOLTNER advised CS-1 to meet her at a grocery store in Sterling, Virginia, at 11:45 p.m. on January 17, 2019.

24.     On January 17, 2019, investigators, including UC-1, provided CS-1 with $200 in buy funds and kept the other $150 in buy funds in an attempt to purchase directly from

WOLTNER. CS-1 and UC-1 then drove to the grocery store. Investigators observed WOLTNER driving a vehicle registered to her. She was the sole occupant in the vehicle.

25.     At approximately 11:52 p.m., CS-1 and UC-1 arrived at the grocery store parking lot and parked near WOLTNER's vehicle. CS-1 and UC-1 exited their vehicle and approached the driver's side of WOLTNER's vehicle. CS-1 and UC-1 each provided WOLTNER with their individual buy funds. UC-1 asked WOLTNER if she could put the heroin into two separate bags so that UC-1 and CS-1 did not have to split it up on their own. WOLTNER agreed and told UC-1 and CS-1 that she would contact them when she was on her way back. WOLTNER then left the grocery store and investigators surveilled her as she drove directly the SUBJECT PREMISES.

26.     Investigators observed WOLTNER enter the SUBJECT PREMISES. WOLTNER sent CS-1 a text message at 12:51 a.m. that stated that she was 30 minutes out and would meet CS-1 and UC-1 at a gas station in Sterling, Virginia. At 1:11 a.m., investigators observed WOLTNER exit the SUBJECT PREMISES and enter her vehicle. WOLTNER then drove directly to the gas station and arrived at 1:20 a.m.

27.     CS-1 and UC-1 arrived at the gas station at 1:23 a.m. and parked near WOLTNER's vehicle. CS-1 and UC-1 exited their vehicle and approached WOLTNER's driver's side window. WOLTNER handed CS-1 a cigarette box containing two plastic bags each of which held a powdery substance consistent with heroin. CS-1 and UC-1 returned to their vehicle and CS-1 provided the cigarette box to UC-1.

28.     The substances were packaged and submitted to the DEA Mid-Atlantic laboratory for chemical analysis. Analysis is pending.

29.     Investigators reviewed cell phone toll analysis around the time of the controlled purchase and determined that WOLTNER's cell phone was in communication with JOHNSON's cell phone multiple times before and after communicating with CS-1.

30.     On January 24, 2019, investigators conducted surveillance at the SUBJECT PREMISES. At 1:48 p.m., investigators observed the vehicle registered to LIVENGOOD, referenced in paragraph 13. JOHNSON exited the front driver's side of the vehicle and walked to the rear of the SUBJECT PREMISES and entered the back basement door.

31.     At 2:11 p.m., investigators saw LIVENGOOD leave the SUBJECT PREMISES and get into a vehicle registered to MARCH.

32.     At 2:28 p.m., law enforcement observed a vehicle park across the street from the SUBJECT PREMISES. At 2:30 p.m., BOWERS exited the SUBJECT PREMISES and got into the passenger side of the vehicle. The vehicle made a loop around the neighborhood and dropped off BOWERS nearby at 2:34 p.m. Investigators then saw BOWERS go back into the SUBJECT PREMISES.

33.     On January 25, 2019, CS-2 contacted NGUYEN via Facebook and asked to purchase one gram of heroin and asked if NGUYEN's guy would do it for $140. NGUYEN advised that he would and asked CS-2 to meet him at the SUBJECT PREMISES to conduct the transaction.

34.     Investigators gave CS-2 an audio recording device, a covert video camera, and $140 in buy funds. CS-2 and UC-2 drove together to the SUBJECT PREMISES and arrived at approximately 5:35 p.m. CS-2 exited the vehicle and walked to the rear of the SUBJECT PREMISES  where he met with NGUYEN. Investigators observed an exchange between CS-2 and NGUYEN. Investigators also heard CS-2 and NGUYEN talk about CS-2 getting to meet

JOHNSON in the future. CS-2 returned to UC-2's vehicle and provided UC-2 with a plastic bag containing a powdery substance and CS-2 and UC-2 left the area.

35.     The substance was packaged and sent to the DEA Mid-Atlantic lab for chemical analysis. Analysis is pending.

36.     On January 28, 2019, UC-1 contacted WOLTNER via text message and asked to purchase two grams of heroin the following day. WOLTNER agreed and told UC-1 that it would be $400. WOLTNER also requested an additional $20 for gas money and for her travel time because she would have to travel to pick up the heroin.

37.     On January 29, 2019, WOLTNER contacted UC-1 and asked to meet at 10:45 p.m. at the same grocery store at which they had previously met. Investigators observed WOLTNER arrive at 10:46 p.m. in a vehicle registered to her. At approximately 10:49 p.m., UC-1 arrived in the parking lot and parked near WOLTNER's vehicle. UC-1 and WOLTNER both exited their vehicles at the same time and stood outside of their vehicles. UC-1 provided WOLTNER with $420 in buy funds. WOLTNER told UC-1 that she would have to travel approximately 40 minutes to her source and estimated that she would return with the heroin in approximately one hour and 30 minutes. WOLTNER and UC-1 both returned to their vehicles and left the area.

38.     Investigators maintained surveillance on WOLTNER as she drove from the grocery store directly to the SUBJECT PREMISES. She arrived at approximately 11:02 p.m., parked in front, and entered the SUBJECT PREMISES.

39.     At 11:50 p.m., WOLTNER contacted UC-1 via text message and advised him to meet at 12:30 a.m. at the same gas station at which they had previously met. At approximately 12:06 a.m., UC-1 arrived at the gas station.

11

40.     Investigators observed WOLTNER exit the SUBJECT PREMISES at 12:15 a.m. and enter her vehicle. She drove directly to the gas station and arrived at 12:20 a.m. WOLTNER approached UC-1's driver's side window and gave UC-1 a cigarette box containing two plastic bags each of which held a powdery substance consistent with heroin. WOLTNER told UC-1 to be careful with the stuff and that she believed UC-1 had not had that stuff before. WOLTNER returned to her vehicle and left the area.

41.     Law enforcement packaged the substance and submitted it to the DEA Mid-Atlantic laboratory for chemical analysis. Analysis is pending.

42.     Law enforcement reviewed cell phone toll analysis from the timeframe of the controlled purchase and determined that WOLTNER's cell phone was in communication with JOHNSON's cell phone before and after communicating with UC-1.

43.     On January 29, 2019, law enforcement conducted surveillance at the SUBJECT PREMISES. At 1:55 p.m., investigators saw BOWERS exit the SUBJECT PREMISES and walk to a street corner. The same vehicle referenced in paragraph 26 stopped and picked up BOWERS. The vehicle drove around the block and dropped BOWERS off at the SUBJECT PREMISES. Investigators saw BOWERS reenter the SUBJECT PREMISES.

44.     Investigators watched this vehicle stop nearby and observed the driver and sole occupant apparently preparing to use drugs. Investigators approached the vehicle and saw suspected heroin in the vehicle. This individual, hereinafter referred to as CS-3, agreed to cooperate with investigators. The suspected heroin was packaged and sent to the DEA Mid-Atlantic lab for analysis. Analysis is pending.

45.     CS-3 told investigators that he had just purchased $100 of heroin from JOHNSON. CS-3 advised that he contacted JOHNSON on JOHNSON's cell phone and

JOHNSON told CS-5 to come to the SUBJECT PREMISES and that he would send BOWERS out to serve him.

46.     On February 1, 2019, CS-2 contacted NGUYEN via Facebook and asked to purchase one gram of heroin. NGUYEN advised CS-2 that "his guy" was waiting on more product. NGUYEN would let CS-2 know when his source was ready. During this timeframe, law enforcement monitored the GPS tracking device which was deployed on a vehicle registered to MARCH. According to the tracking data, the vehicle departed from the hotel at which MARCH and LIVENGOOD reside and drove directly to the SUBJECT PREMISES. The vehicle was at the SUBJECT PREMISES for a short period before it left and proceeded directly to Baltimore, Maryland. Around the time that the vehicle returned to Virginia from Baltimore, NGUYEN sent a Facebook message to CS-2 advising that "his guy" was good again.

47.     Investigators reviewed images from a surveillance camera in the area of the SUBJECT PREMISES and observed the vehicle arrive shortly after NGUYEN sent the Facebook message to CS-2. Surveillance video showed MARCH and LIVENGOOD exit the vehicle and walk to the back of the SUBJECT PREMISES. Surveillance camera images showed MARCH and LIVENGOOD leave the SUBJECT PREMISES a short time later.

48.     I know based on my training and experience that many DTOs that operate in the Eastern District of Virginia obtain heroin for sale from sources of supply in Baltimore.

49.     Investigators, including UC-2, then met with CS-2 and gave him an audio recording device, a covert video camera, and $150 in buy funds. CS-2 got into UC-2's vehicle and they drove together to the SUBJECT PREMISES and arrived at 5:24 p.m.

50.     Once they arrived, CS-2 exited UC-2's vehicle and walked to the rear of the SUBJECT PREMISES, where he was let inside by NGUYEN. CS-2 asked NGUYEN if he

would sell the gram of heroin for $130 instead of $140 and NGUYEN advised that he would have to check with "his guy." NGUYEN walked down the hall to a bedroom on the left side and NGUYEN could be heard talking to a male, believed to be JOHNSON, who agreed to sell the gram for $130. CS-2 provided NGUYEN with the $130 in buy funds in exchange for the plastic bag containing a powdery substance. CS-2 then exited the SUBJECT PREMISES, got back into the vehicle with UC-2 and provided UC-2 with the remaining buy funds as well as the plastic bag containing the suspected heroin.

51.     The substance was packaged and submitted to the DEA Mid-Atlantic lab for chemical analysis. Analysis is pending.

52.     On February 5, 2019, CS-2 contacted NGUYEN via Facebook and asked to purchase heroin. NGUYEN told CS-2 to come to the SUBJECT PREMISES later that day and he would introduce him to "his guy."

53.     Investigators, including UC-2, gave CS-2 an audio recording device, covert video camera, and $450 in buy funds. CS-2 and UC-2 then drove to the SUBJECT PREMISES and arrived at approximately 5:40 p.m.

54.     CS-2 exited the vehicle and walked to the back door of the SUBJECT PREMISES and was let inside by NGUYEN. While inside the SUBJECT PREMISES, NGUYEN introduced CS-2 to JOHNSON. JOHNSON told CS-2 of his prices for grams of heroin and said that if CS-2 was going to purchase from him [JOHNSON] daily, he would work on the prices. JOHNSON told CS-2 that he has people drive to the city for him to pick up heroin.

55.     CS-2 told JOHNSON that he was looking to purchase three grams of heroin. JOHNSON set three bags down on a table. JOHNSON said that two bags (which later were determined to contain a black rock like substance) were "shooters" and the third bag was the

better stuff. JOHNSON told CS-2 that the cost of the three bags was $360. CS-2 provided JOHNSON with $360 in buy funds and left the SUBJECT PREMISES. CS-2 returned to UC-2's vehicle and provided UC-2 with the three bags containing suspected heroin.

56.     Investigators field-tested one of the rock-like substances which was positive for heroin. All three of the bags were packaged and submitted to the DEA Mid-Atlantic lab for chemical analysis. Analysis is pending.

57.     On January 25, 2019, a tracking device was deployed on MARCH's vehicle. According to the tracking device, almost daily, the vehicle left the hotel at which MARCH and LIVENGOOD resided and drove to the SUBJECT PREMISES where it remained for a short period of time. The vehicle then traveled to Baltimore, Maryland, where it stayed for a short period of time before driving back to the SUBJECT PREMISES. Once the vehicle returned to the SUBJECT PREMISES, it remained for a short period of time before returning back to the hotel. Through surveillance cameras and physical surveillance in the area of the SUBJECT PREMISES, investigators determined that this vehicle is driven by LIVENGOOD and MARCH is usually a passenger in the vehicle. This observation is consistent with CS-3's statements that LIVENGOOD and MARCH are couriers for JOHNSON.

58.     Agents have conducted multiple surveillance operations and have observed JOHNSON, MARCH, NGUYEN, LIVENGOOD, BOWERS, and WOLTNER going to and leaving the SUBJECT PREMISES. "Ping" data from JOHNSON's, MARCH's, and LIVENGOOD's cell phones also corroborate their movements to and from the SUBJECT PREMISES.

### III. Conclusion

59.    Based on the information provided in this affidavit, I submit that probable cause exists to believe that evidence of narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846, specifically those items set forth in Attachment B, are contained within the SUBJECT PREMISES, further described in Attachment A. Accordingly, I respectfully request a warrant to search the SUBJECT PREMISES.

Jenna Sullivan, Task Force Officer
Drug Enforcement Administration

Sworn and subscribed to before me the ⟩ ⟩ day of February 2019.

/s/

John F. Anderson
The Honorable John F. Anderson
United States Magistrate Judge

16

## ATTACHMENT A

## <u>LOCATION TO BE SEARCHED</u>

The address known as **1115 S WILLIAMSBURG CT STERLING, VIRGINIA** is a two level, single family dwelling. The dwelling is constructed of light colored siding with red brick underneath, and brown trim. The numbers "1115" are affixed above the front door. The main entrance is situated right of center of the front of the structure. The driveway is positioned to the right of the structure with a concrete walkway leading to two steps which lead to the front door.

This location is within the Eastern District of Virginia.

## ATTACHMENT B

## PROPERTY TO BE SEIZED

1.      Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, and packaging of illegal narcotics substances, as well as the use of illegal controlled substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles, and syringes, and written articles on the use and effects of narcotics, diluents, and cutting agents.

2.      Items used in the manufacture of illegal narcotics substances, including precursor chemicals, chemistry guides, glassware, and flasks.

3.      Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets, and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records.

4.      Books, records, receipts, notes, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances.

5.      Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage, and expenditure of money.

6.     United States currency, precious metals, jewelry, and financial instruments, stocks and bonds.

7.     Photographs, in particular photographs of co-conspirators, assets, and controlled substances.

8.     Weapons, including but not limited to revolvers, semi-automatic pistols, rifles, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including but not limited to gun-cleaning kits, gun-sights, holsters, and receipts and documentation for the purchased of same, and related firearm paraphernalia.

9.     Cellular telephones, cameras, and records and receipts reflecting their ownership and use.

10.    Safes, both combination and key type, and their contents.

11.    Indicia of occupancy, residence and ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes, and keys.

12.    Any and all electronic data processing and storage devices, computers and computer systems, other digital media, keyboards, Central Processing Units, external and internal drives, external and internal storage devices such as magnetic tapes and disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.